HENRY D. GEE CO. *v.* UNITED STATES

**No. 7621.**—Invoice dated Vancouver, B. C., Canada, February 12, 1946.
Certified February 12, 1946.
Entered at Seattle, Wash., February 15, 1946.
Entry No. 1246.

(Decided October 5, 1948)

*Lawrence, Tuttle & Harper* (*George R. Tuttle, Walter I. Carpeneti,* and *Charles J. Evans* of counsel) for the plaintiff.

*Charles J. Miville,* Acting Head, Customs Division, Assistant Attorney General's Office (*Joseph E. Weil* and *Daniel I. Auster,* special attorneys), for the defendant.

CLINE, Judge: This is an appeal for reappraisement of mixed feed oats (screenings) imported from Canada on February 13, 1946. The merchandise was invoiced at $38.45 (U. S. currency) per ton of 2,000 pounds, c. & f. Seattle, including freight charges and an equalization fee of 12 cents per bushel of 34 pounds. At the time of entry the amount of the equalization fee was deducted and then added back under a certificate of pending reappraisement, pursuant to the provisions of section 503 (b) of the Tariff Act of 1930. The merchandise was appraised as entered.

It is claimed that the equalization fee is not a part of the dutiable value of the merchandise.

At the trial, plaintiff called Philip P. Wolfe, manager of James Richardson & Sons, Ltd., in Vancouver, who testified that his firm did a general export business, handled all grains,[1] and maintained grain elevators in Canada and a terminal in Vancouver; that he had been manager for 22 years and was actively engaged in buying and selling grain and grain products during January and February 1946; that he was familiar with the price of mixed feed oats because he dealt with that commodity daily; that it is sold mostly for export, but some of it is used for local home consumption; that mixed feed oats had not been sold in Vancouver for consumption in Canada since 1941 because more money could be obtained by selling them for export; that his firm was willing to sell them in Vancouver for home consumption at the same price as could be obtained for export; that the Canadian Government had set up a ceiling price of $31.35 (Canadian currency) per ton of 2,000 pounds for this commodity in 1942; that it was offered for export to the United States during the first 2 weeks of February 1946 at $31.35 (Canadian currency), plus the equalization fee, plus a profit.

In regard to the equalization fee, the witness testified:

Equalization fee is a fee that was established by the Dominion Government. They set a ceiling on all oats at $31.35, loaded on the cars in Vancouver, and we were able to sell it for export at $35.43. They put on an equalization fee, and it went back to the farmers.

He explained that the amount of the fee was subject to change each day; that advice of the changes was posted on the bulletin board at the Merchants' Exchange at 11 o'clock each day under the name of the Canadian Wheat Board; that the Equalization Board issued permits for the export of grain upon payment of the equalization fee in effect that day; that permits are bought at the rate in effect on the date of purchase and may be used in connection with later shipments of grain then owned or thereafter acquired; that the purchaser of the permit hopes that at the time he sells his merchandise for export the equalization fee will be higher, because he will make that much more profit on his sale, since he could sell on the basis of the equalization fee on the day of exportation; that the fees were paid to the Canadian Wheat Board and at the end of the year the amount was divided up on a bushel basis among the farmers according to the number of bushels they delivered; that the equalization fee did not apply to transactions between Canadian residents but only to export sales. He also stated:

The Wheat Board tried to keep abreast of the values for export, and kept the equalization fee in line so we couldn't make too much profit, and we were pretty generous in our information, and we were supposed to keep them advised what we could sell it for export for.

In connection with the instant merchandise, Mr. Wolfe testified that the equalization fee paid was at the rate of 12 cents per bushel; that the merchandise was sold on February 1, 1946, to Henry D. Gee Co. at a price of $38.45 (U. S. currency) and exported on February 12, 1946; that that price included the selling price of $31.35 (Canadian currency), plus 12 cents per bushel equalization fee, plus freight to Seattle; that on the date of exportation his firm was offering the merchandise to United States buyers at $38.45; that it figured the charges and equalization fee and offered at that price; that sales were made at delivered prices, including equalization fee and freight.

William H. Gee testified that he was in the wholesale grain business in Seattle; that during 1945 he bought grain and grain products delivered in Seattle from firms in Canada; that he was constantly in touch with the market in Vancouver; that he bought mixed feed oats during the first 2 months of 1946 "on the basis of bulk delivered Seattle, all charges paid," including duty.

Plaintiff claims that the proper dutiable value is the export value and that that value is the entered value, less the amount of the equalization fee.

The foreign value is not in issue. It was fixed by the Canadian

Government at a ceiling price of $31.35 (Canadian currency) per ton of 2,000 pounds. It further appears from the record that the equalization fee did not apply to domestic sales. There is no claim that the export value is lower than this price.

Plaintiff claims that the equalization fee is an export tax and that it is therefore not a part of export value as defined in section 402 (d) of the Tariff Act of 1930, citing *Sternfeld* v. *United States*, 12 Ct. Cust. Appls. 172, T. D. 40065, and *United States* v. *Tadross & Co.*, 14 Ct. Cust. Appls. 10, T. D. 41528.

In the *Sternfeld* case the issue was submitted on a stipulation that—

The addition made by the appraiser to the entered value in each of these reappraisements equals the amount of an export tax assessed by the Government of China upon the merchandise in question when exported from China.

The court stated that an export tax could not be added to market value to make export value, but in order to be a part of export value, it had to be included in the market value, and held in regard to the particular tax involved that (pp. 173-4):

* * * In this case the export tax was not an element to be considered in determining market value, nor was it a part thereof, for the reason that, as we construe the stipulation, the tax did not accrue when the manufacturers sold such or similar merchandise, but did accrue only in case the merchandise was exported and at the time when it was exported. Therefore, the wholesale price of such or similar merchandise did not include the export tax. If the wholesale price of such or similar merchandise did not include the tax and if the purchasers of such merchandise "in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States," did not pay a price sufficient to cover the tax, the market value did not include it, even though the tax was paid by the purchasers upon exportation of the merchandise. And the tax not being included in the market value or price, it follows that the export value did not include it, and accordingly the entered value of the merchandise equaled the export value thereof. * * . *

The *Tadross* case involved importations of Chinese and Persian rugs. The Chinese rugs were purchased by importer's agents at a market price which included no expenses of any kind; the agents paid the expenses of packing and shipping and drew against a letter of credit for the total expense which included commissions computed on the purchase price and an export tax imposed only when goods were exported and not on goods remaining within China.

The Persian rugs were purchased the same way. When the shipment passed the Persian customs officers, a penalty or additional duty was imposed upon such rugs as were found to be aniline dyed. No such tax was imposed upon goods not exported. The purchasing agents included this charge with the purchase price in their draft upon the importer.

The court found that the price paid for the goods was the price at which such merchandise was freely offered to all purchasers either for

home consumption or for export and that such price did not include the export or the aniline tax; that such taxes constituted no part of the purchase price and were imposed upon and paid by the purchasers; and that they were not a part of export value.

The facts in the instant case are different. Here the tax was not necessarily paid at the time of exportation but the permit might be purchased by the exporter in anticipation of shipment and even before he owned the merchandise; it was not imposed upon the purchasers but was paid by the exporter and included by him in the purchase price; the amount charged was at the rate of the equalization fee on the date of exportation and might be more or less than the fee actually paid by the exporter.

The manager of the exporting firm stated that its price included the selling price of $31.35 (Canadian currency), the equalization fee, the profit, and the freight charges, but it does not appear that the merchandise was offered for sale on such an itemized basis. In this connection Mr. Wolfe testified as follows:

X Q. You didn't itemize these various charges? Your sales price just included them all, equalization fee, etc.?—A. We figured all those things, and offered at that price.

Since the price at which the merchandise was freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, included the equalization fee, such fee is a part of market value and is properly included in the dutiable export value.

Furthermore, the equalization fee seems to have been in the nature of an excess profits tax on exporters, keeping their profits down and giving the benefit to the farmers. It may be inferred that the selling price would have been as high without the equalization fee, but that the profit would have accrued to the exporter rather than to the farmer.

On the record herein, I find the export value, as that value is defined in section 402 (d) of the Tariff Act of 1930, to be the proper basis for the determination of the value of the merchandise here involved, and that such value is the appraised value.

Judgment will be rendered accordingly.